Good morning. May it please the court. I'm Betsy Sheppard on behalf of Ms. Huerta. This is a social security disability case and there's a number of issues that we covered in our brief but today I'd like to focus on the ALJ's improper reliance on Ms. Huerta's activities of daily living and to reject Ms. Huerta's own testimony and to reject the opinions of the treating doctors. I'm sorry, did someone say something? No, go ahead. I'm sorry. Okay. Now these activities specifically that the ALJ said were inconsistent with Ms. Huerta's allegations of disability. The first one was her ability to drive her daughter to school. The ALJ said that this activity showed that she could concentrate and pay attention well enough to sustain work activity because driving requires extensive attention and concentration. But Ms. Huerta's testimony was that she only is able to engage in this activity once or twice a week because she's having a good day and she's feeling well. It's our position that the ability to drive a car, to drive a child to school once or twice a week does not demonstrate that Ms. Huerta has the ability to concentrate on work activity for eight hours a day, 40 hours a week as would be consistent with full-time work. Okay, and one of the next things that the ALJ relied on was her ability to do household activities like loading the dishwasher. And the ALJ said that her ability to do these activities in a home setting indicated that she was not as limited as she alleged. But if we go back to Ms. Huerta's testimony, her testimony was not that her impairments are so debilitating that she can never do any type of activity that she's in bed all day long. That's not what she testified. She stated that she can be active for a few minutes, 10 to 15 minutes on her good days. She can open the door to let the dog out. She can load the dishwasher. She can occasionally drive her daughter to school. But when she has an attack of her migraines, her symptoms increase to the point where she needs to take a break. She has to lie down. So the ALJ's use of these activities, they're not actually inconsistent with her testimony or the opinions of her doctors. Can I just ask a fundamental question here? How is this case any different than a lot of these where there's conflicting evidence below? And there does seem to be, you've got experts that say she's, you know, her treating physicians that say she really is limited. You have some who say that they don't think she is and that she could perform effectively the duties of her prior work. And you also have the plaintiff and the plaintiff's husband who have, you know, stated that their disabilities are great. But where you have this conflicting testimony and the ALJ walks through it, how is this case any different than in all these, you know, so many cases where we just give deference to the ALJ and say that as long as the ALJ's statements were supported by substantial evidence, they should be affirmed? Okay, well in this specific case, the ALJ did rely somewhat on the opinions of the non-examining experts from Social Security who said that Ms. Huerta was not as limited as she alleged. But those doctors opined that Ms. Huerta could do light exertional level activity. And when the ALJ went to make the decision, he specifically stated that Ms. Huerta was actually more limited than that. And in general, accepted large portions of the opinions of her treating doctor that she needed the option to sit or stand at will and that she had greater limitations than what these non-examining experts had said. So, in resolving these conflicts... The ALJ erred in relying and giving any greater credibility to their testimony than to the plaintiff? Well, in many of these cases, that would be our argument. But here, the ALJ didn't actually appear to give more weight to the non-examining doctor's opinions because they said that she was limited and sedentary and would need to sit or stand at will. So then we get into, once we move past the part where the ALJ has basically rejected parts of the non-examining doctor's opinions, then we look at how the ALJ analyzed the treating doctor's opinions. And in this case, while we have Dr. Abelick, I think that's how you pronounce it, said that she would need a 10-minute break after every 50 minutes of standing, which the ALJ interpreted to mean she would need to sit or stand at will. So, in essence, the ALJ did not rely on the non-examining doctors here. The ALJ, for the most part, relied on the opinions of the treating doctors. And our position is that the ALJ improperly failed to include parts of the opinions of the treating doctors, which would establish disability of acceptance. Does that answer your question or not really? No, that's helpful. Thank you. Okay. And one additional issue that I'd like to point out very quickly is that it's also our position that the past work that the ALJ found she could return to, that of a hospital admitting clerk, this is a sedentary job as described in the DOT. The ALJ's RFC finding indicated that Ms. Huerta would need to be able to sit or stand at will, which means your workstation would likely be set up so that your computer is in a position where you would use it while seated. And the BE's testimony was that this job would be suitable as long as she could stay at the workstation when she needed to take her sit and stand breaks, that she'd still be able to help a customer. So let's imagine she's sitting at her desk at the hospital. She has just now needed to take a break to stand up. And at that point in time, that's when a patient walks in needing to be admitted. He needs to enter the patient's information into the computer, but her workstation is set up for her to be seated. So she can't necessarily reach all the things that she needs to reach in order to help this patient. So it's our position that this job would not be performable given the ALJ's own findings with regard to Ms. Huerta's limitations. Counsel, did you want to reserve any time for rebuttal? Yes, Your Honor. I'll reserve it. Okay. All right. Thank you. Ms. Lerkind? Yes, Lerkind. May it please the Court, my name is Margaret Lerkind on behalf of the Commissioner of Social Security. Good morning, Your Honors. Good morning. Someone say something? I just said good morning. Oh, good morning. Klayman alleged in her application for benefits and at her hearing that she experiences stroke-like symptoms 24 hours a day, seven days a week, with paralysis, constant pain and weakness, speech difficulty, vision changes, mental confusion, and concentration problems. She testified that she can stand for 15 minutes and can sit for 15 minutes at a time. The problem with this record is that Klayman's allegations are simply not supported by the objective medical evidence or the other evidence in the record. Her allegations are not supported by her daily activities, which included taking care of her young daughter, attending church regularly, attending fellowship at friends' houses, reading, driving, light household tours. And Klayman did not consistently report the symptoms that she alleges to her medical providers when those symptoms, if they were going on to that degree, are very concerning symptoms. So I think that's the main thrust of this case. And I think the ALJ does a very detailed job explaining how Klayman's symptoms are simply not fully supported by this medical record. Counsel, excuse me. You said that her testimony was that she had these headaches 24 hours a day. Is that what the, is that what the, I just, I'm not that familiar with the record. Is that what the treating physician said? The treating physician did not say that she was experiencing them 24 hours seven days a week. In other notes within the record, the Klayman reported that she was having two headaches a month. So, and the ALJ notes that inconsistency in the record. He didn't, he didn't, he was lying. I'm sorry? Didn't, he didn't say he disbelieved her testimony, but he said that he accepted what was in the, what the, what the treating physician and what was in the notes said. Is that correct? Yes, that's correct. Okay. I wanted to note also that the objective evidence in this case is, is fairly benign. The mental status examinations are mostly normal. Klayman is described as having excellent judgment and impulse control, good insight, intact memory, normal attention and concentration, fund of knowledge. And I think that's important because part of her allegations are that she, through her migraines, experiences mental confusion. But the objective evidence from her providers doesn't support that. Similarly, her physical examinations of her knee after her surgery show that she's walking, she's toe heel walking, she's jumping up and down. She can partially squat. So that being said, I think it's also important to note in this case that the ALJ found a very limiting RFC that precludes most jobs in the national economy. The ALJ limited the claim until less than sedentary work and took into account most of her alleged limitations with respect to her knee impairment and her obesity. But even with that very limiting RFC, the ALJ found that the Klayman's past work, as generally performed in the national economy, that she could perform, that it was still available. And that directed a finding of non-disability. Council, what is driving, why is her ability to drive twice a week when she doesn't have a job? How does that show that she's able to go to work full time? I was going to address that point next. My colleague mentioned the ALJ's assessment of the Klayman's activities of daily living. And I think that there's a dispute there between about, or how the ALJ assesses daily activities. In this instance, I think he's comparing the Klayman's allegations that she's having stroke-like symptoms 24 hours a day, seven days a week, with paralysis, mental confusion. And comparing that, and saying, you know, even someone who's driving her daughter two days a week to school probably wouldn't be getting behind the wheel of a motor vehicle. And that's a proper reason for, you know, rejecting subjective symptom testimony under Molina. How does that relate to the treating, rejecting the treating physician's assessment of her ability to work? Because he didn't, he wasn't relying on her having these headaches all the time. Are you referring to Dr. Warren's, the treating Dr. Warren's opinion? Well, Klayman's, Klayman's ability to drive even twice a week undermines Dr. Warren's opinion that the Klayman would need three to four breaks throughout the day, every day. Well, I don't see any inconsistency. Well, I mean, the ALJ also provides other good reasons for rejecting Dr. Warren's opinion. I mean, what is the best reason for rejecting his opinion? What is the best reason? Yes. It's, Dr. Warren's opinion is not supported by her own treatment records with the Klayman.  Klayman headaches are not supported throughout the record. There's, they've been extensively worked up. And Klayman's, the ALJ points to the fact that the Klayman is not consistently taking medications for her migraine headaches. She's not on a prophylactic medication, which is a pretty normal course for migraine headaches. She testified at her hearing that she takes abortive medication when her headaches get really bad, but she doesn't take it regularly. The frequency of headaches is not documented in the record with, in Dr. Warren's, Dr. Warren's notes or with any other neurologist in the records. Klayman also is seen by two other neurologists at Kaiser who both recommend that she take a prophylactic migraine medicine. And she declined that. One neurologist, Dr. Liu, advises that she take norotriptyline, which the Klayman does. And at 40 milligrams, she reports, at night, and she reports that it improves the severity of her headaches. So there's just, when Social Security looks at migraine headaches, and this is outlined in SSR 19-4, they look, it's very similar to the way they look at seizure disorder. They look at adherence to medication, a documentation of the frequency and severity of the migraine headaches. If there's a migraine headache log, and you just don't see that workup, or that kind of documentation in this record. So I think that's probably the best reason is that Dr. Warren's opinion is just not supported by the objective evidence in that case. And I do note that in the Klayman's arguments, she does not challenge the ALJ's assessment of the objective evidence in this case. And the district court found that that was one of the most important reasons for upholding the ALJ's symptom testimony analysis. So I wanted to address also the applicable standard for assessing the opinion evidence in this case. Klayman asserts that the standard is clear and convincing. But because all of the And that's Bayless versus Barnhart. And the last point I wanted to make that I think is important is Dr. Abelik's opinion. There's a harmless error argument here with respect to the ALJ's assessment of that opinion. Should the court find that the ALJ erred with respect to rejecting Dr. Abelik's postural limitations, which we don't think the ALJ did err, but should the court find that that error would be harmless because the step four job that the ALJ found that Klayman could perform does not require any postural limitations, according to the DOT as generally performed. I'm sorry. Yeah, I think your time's expired. We have your argument. Thank you. And I would like to address the issue of Klayman's testimony about having stroke-like symptoms 24 hours a day. I'm looking at page 50 of the record, which is the transcript of the hearing. And what she actually said was that the aspect of her symptoms that is constant is the weakness and the feeling of pressure in the left side of her body. She didn't say that she has the severe migraine symptoms 24 hours a day. She stated that that happens about 10 times a month. So that's in the mental confusion and all of those other difficulty concentrating. 10 migraines a month. I mean, that's one every three days. That's a lot of migraines. I mean, that's a terrible burden to bear. Is there anything in the medical records that reflects that she told a doctor she was having 10 migraines a month? I can't point to a specific instance where she stated that frequency, but I would like to note that she was given abortive medication by her doctors to treat the migraines. So if you have that medication at home and you get a migraine, you're going to take it as your doctor directed, and that wouldn't necessarily appear at the doctor's office every time. I'm just wondering whether there's any doctor that she saw that she said, I'm having 10 migraines a month and the doctor noted it in the notes. It's just a very large, impressive number. And again, that's a terrible burden for her to bear. It just seems like that's the kind of thing she would have told some doctor and somebody would have written it down because that's a lot. Did anybody write that down? Not to my knowledge, your honor. I see that my time is up. So unless you have further questions, always. No, I think we have your argument. Thank you very much. Thank you to both counsel for your arguments in this case, and the case is now submitted.
judges: Schroeder, Bybee, Nelson